Patton Dycus
Emma Shahabi
Shiloh Hernandez
Earthjustice
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699 | Phone
(406) 586-9695 | Fax
pdycus@earthjustice.org
eshahabi@earthjustice.org
shernandez@earthjustice.org

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| CABINET RESOURCE GROUP, CLARK FORK COALITION, EARTHWORKS, MONTANA ENVIRONMENTAL INFORMATION CENTER, SAVE OUR CABINETS, and YAAK VALLEY FOREST COUNCIL, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. FOREST SERVICE; TOM SCHULTZ, Chief of the U.S. Forest Service; CHAD BENSON, Kootenai National Forest Supervisor; U.S. FISH AND WILDLIFE SERVICE; BRIAN NESVIK, Director of the U.S. Fish and Wildlife Service, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      Plaintiffs bring this lawsuit to challenge unlawful and arbitrary determinations by the U.S. Forest Service and U.S. Fish and Wildlife Service ("FWS") that a large copper and silver mining exploration project in northwest Montana's Cabinet Mountains will satisfy legal mandates from the Endangered Species Act ("ESA"), National Environmental Policy Act ("NEPA"), and National Forest Management Act ("NFMA"). Plaintiffs also challenge the Forest Service's decision notice approving the exploration in reliance on these unlawful and arbitrary determinations.

2.      The Cabinet Mountains, including the federally-designated Cabinet Mountains Wilderness, are home to bull trout and grizzly bears—species that have lost most of their viable habitat and are listed as threatened under the ESA. In October 2025, the Forest Service approved Montanore Minerals Corporation's ("Montanore's") "Libby Exploration Project," a 16-year industrial mining project that would further harm these already imperiled species and their important habitat. Montanore's project, which would assess the economic value of future underground copper and silver mining, would dewater

1

approximately 7,000 feet of existing mine adit and further tunnel under the Cabinet Mountains Wilderness in constructing an additional 4,200 feet of adit. The Forest Service's authorization is required for this project because access roads are located in the Kootenai National Forest and exploration will occur under the national forest, including under the Cabinet Mountains Wilderness.

3.    The Forest Service approved Montanore's exploration project more than eight years after this Court, in 2017, invalidated conclusions by FWS and the Forest Service that full-scale operation (*i.e.*, exploration, construction, mining, and closure) of the same mine by Montanore would comply with Montana's water quality standards and would not jeopardize the continued existence of bull trout and grizzly bears. *Save Our Cabinets v. Dep't of Agric.*, 254 F. Supp. 3d 1241 (D. Mont. 2017); *Save Our Cabinets v. U.S. Fish & Wildlife Serv*, 255 F. Supp. 3d 1035 (D. Mont. 2017). Among other things, the Court held that FWS' no-jeopardy conclusion for bull trout was arbitrary given (a) the magnitude of the mining project's effects on bull trout and (b) FWS' own determination that local populations were essential to the health of the species. *Save Our Cabinets*, 255 F. Supp. 3d at 1046–51. In holding that

2

FWS' no-jeopardy conclusion for grizzly bears was arbitrary, the Court noted that under "current conditions it is difficult to imagine how action that results in anything other than net improvement for grizzly bears can survive scrutiny under the ESA." *Id.* at 1062 (citation omitted).

4.    Now, after the court rejected the agencies' conclusions regarding full-scale mining, Montanore has segmented the project and asked the Forest Service to approve only the first phase of mining—an extensive exploration project. In separate biological assessments ("BAs") for aquatic and terrestrial species, the Forest Service arbitrarily determined under the ESA that this exploration project "may affect" but is "not likely to adversely affect" already fragile populations of bull trout and grizzly bears and their important habitat. In addition to being irrational, these conclusions violate the ESA's mandate to use the best available scientific data. FWS wrongly concurred with the Forest Service's arbitrary and unlawful ESA conclusions.

5.    The Forest Service also violated the ESA requirement to reinitiate consultation with FWS when new information—here, Montana's repeal of numeric water quality standards for nutrients—

3

reveals potential impacts not previously considered as part of the ESA analysis.

6.      In addition, the Forest Service violated NEPA and NFMA. First, the Forest Service violated NEPA by failing to take a "hard look" at the potential negative impacts of Montanore's industrial exploration project, including harms to bull trout and grizzly bears, reduced water quality, and potential drawdown of Wilderness waters. The Forest Service also violated NEPA by failing to prepare an Environmental Impact Statement ("EIS"), which NEPA requires for actions significantly affecting the quality of the environment. Finally, the Forest Service violated NFMA by failing to rationally show that Montanore's project would comply with forest plan requirements regarding grizzly bear habitat.

## JURISDICTION AND VENUE

7.      Plaintiffs bring this action under the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701-706, and the ESA's citizen suit provision, 16 U.S.C. § 1540(g), both of which waive Defendants' sovereign immunity. As required by the ESA's citizen suit provision, Plaintiffs, on January 29, 2026, provided

4

Defendants with notice of the ESA violations alleged in this complaint. *See id.* § 1540(g)(2)(A)(i); Ex. 1, Notice of Intent to Sue.

8.    This Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 (federal question), as well as the ESA's citizen-suit provision, 16 U.S.C. § 1540(g), and may issue a declaratory judgment and further relief under 28 U.S.C. §§ 2201–02.

9.    Venue lies in this District because: Plaintiffs Cabinet Resource Group, Clark Fork Coalition, Montana Environmental Information Center, Save Our Cabinets, and Yaak Valley Forest Council are headquartered in Montana; the lands at issue in this suit are located in Montana; and a substantial part of the events giving rise to Plaintiffs' legal claims occurred in the District of Montana. 28 U.S.C. § 1391(e)(1). Venue is proper in the Missoula Division of this District because a substantial part of Plaintiffs' claims arise in Lincoln and Sanders Counties. *See* Local Civ. R. 1.2(c)(5), 3.2(b); Mont. Code Ann. § 25-2-125.

## PARTIES

10.    Plaintiff Cabinet Resource Group is a northwest Montana grassroots environmental organization founded in 1976 to protect

Montanan's water quality, air quality, wildlife, forests, and wildlands. The organization began with a fifty-dollar grant and a single effort to rally the community and local Tribes against a dam proposal at the Kootenai Falls. Since then, Cabinet Resource Group has spent fifty years organizing communities in northwest Montana to protect natural resources; support healthy, local, and regenerative economies that practice responsible stewardship of public lands; and empower rural community climate resilience. Cabinet Resource Group's members collaborate on advocacy at the various levels of government, attend meetings, and recreate extensively in the Cabinet Mountains.

11.    Plaintiff Clark Fork Coalition is a nonprofit conservation organization formed in 1985 to protect and restore the Clark Fork watershed. The Coalition is dedicated to working towards a future where the Clark Fork River and its tributaries flow with clean, cold, and abundant water, ensuring the people, animals, plants and environment flourish for generations to come. Clark Fork Coalition furthers improvements through projects, campaigns, advocacy, and outreach efforts across the entire Clark Fork watershed. The Coalition's

members use and enjoy the waters and wilderness and enjoy the wildlife that Montanore's exploration activities will put at risk.

12. Plaintiff Earthworks is a nonprofit organization dedicated to protecting communities and the environment from the adverse effects of mineral development. Earthworks is headquartered in Washington, D.C. and has field offices across the country. Earthworks has a long history of advocacy concerning hard rock mining in the Cabinet-Yaak region of northwest Montana to protect public health, fish, wildlife, and clean water—including throughout the permitting process for Montanore's exploration project. Earthworks members live, work, and recreate in northwest Montana, including the Cabinet Mountains.

13. Plaintiff Montana Environmental Information Center ("MEIC") is a nonprofit environmental advocacy organization founded in 1973 by Montanans concerned with protecting and restoring Montana's natural environment. MEIC advocates for, educates, and empowers people working toward a clean and healthful environment and the protection and restoration of Montana's life-sustaining land, air, water and climate. MEIC assists individuals and local organizations facing environmental problems by providing information,

organizing and tactical advice, and technical assistance. MEIC has thousands of members that support its mission both financially and with their activism, and several members that specifically live, work, and recreate in the Cabinet Mountains.

14. Plaintiff Save Our Cabinets is a Montana nonprofit organization dedicated to protecting wild lands, wildlife, and water quality in the Cabinet Mountains Wilderness and surrounding areas. Its mission is to keep the Cabinet Mountains free from the environmental consequences of hardrock mining and protect habitat for the many threatened species native to the region, including grizzly bear, lynx, bull trout, wolverine, and fisher. Save Our Cabinets is headquartered in Heron, Montana but has members and supporters who reside across Montana, Idaho, Washington, and elsewhere. Many members recreate in the area that would be impacted by the project and own homes or property in the region.

15. Plaintiff Yaak Valley Forest Council is a nonprofit community organization working to ensure that the natural and human communities of northwest Montana are healthy and resilient. Its mission is to protect the last roadless areas in the Yaak Valley and

Kootenai National Forest; maintain and restore the ecological integrity of this geographical zone by conserving habitat for native and sensitive species; encourage and support the development of local economies based on stewardship principles, value-added forest products, habitat conservation and ecological restoration; and educate local residents on the value of protected and restored landscapes for community and economic development. Forest Council members and supporters work in, use, and enjoy the Kootenai National Forest and the lands of the exploration project area for recreation, nature study, photography, and spiritual renewal.

16.    Plaintiffs have a longstanding interest in the preservation and recovery of bull trout, grizzly bear, lands, streams and other waters in the Northern Rocky Mountains region, including the Cabinet-Yaak ecosystem in northwest Montana. Plaintiffs actively seek to protect and recover bull trout, grizzly bears, and waters in the area through a variety of actions, including public outreach and education, investment in animal conflict reduction measures, scientific analysis, advocacy, and when necessary, litigation. Plaintiffs have participated actively in available public comment processes concerning Montanore's exploration

9

project, including by filing extensive comments, objections, and supplemental comments on the proposed and final EAs and draft and final decision notices for the project issued by the Forest Service.

17. Plaintiffs' members, staff, and volunteers use and enjoy the Cabinet Mountains Wilderness and surrounding national forest lands for a wide range of activities, including recreational pursuits such as hiking, camping, backpacking, bird watching, berry picking, and wildlife watching (including observation of bull trout and grizzly bears); as well as spiritual renewal and aesthetic enjoyment. Plaintiffs' members, staff, and/or volunteers have viewed bull trout and grizzly bears or signs of grizzly bear presence in and around the Cabinet Mountains Wilderness and have engaged in extensive scientific, educational, and advocacy efforts aimed at maintaining a healthy and intact ecosystem in the Cabinet Mountains that supports native fish and wildlife.

18. By issuing BAs, an Environmental Assessment ("EA"), a Finding of No Significant Impact ("FONSI"), and a decision notice that are arbitrary and unlawful and allow Montanore's project to proceed in a manner that will or could harm bull trout, grizzly bears, Libby Creek's

10

water quality, and Wilderness waters, Defendants have harmed Plaintiffs' interest in viewing bull trout and grizzly bears, enjoying the pristine waters, and maintaining a healthy and intact ecosystem in the Cabinet Mountains. Accordingly, the legal violations alleged in this complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of the Plaintiffs and their members, staff, and volunteers.

19.    Cabinet Resource Group board members Cesar Hernandez and Colleen Hinds live in Heron, Montana, about eight miles west of the southern border of the Cabinet Mountains. They have been visiting and recreating in the Cabinet Mountains since they first moved to the state in 1973. Hinds and Hernandez often turn to the Cabinet Mountains Wilderness and surrounding national forest lands for recreation—including hiking, fishing, hunting, and berry picking—as well as spiritual fulfillment. Hinds and Hernandez have seen both grizzly bears and bull trout while recreating in the Cabinet Mountains and care deeply about protecting the habitat of these native species. Hernandez also relies on the pristine waters for both their aesthetic

value and their water quality, including for drinking water during hikes.

20.    Clark Fork Coalition member and former executive director, Karen Knudsen, first experienced the Cabinet Mountains Wilderness while leading youth on backcountry hiking and climbing trips in northwest Montana. Since then, Knudsen has continued hiking numerous trails in the Cabinet Mountains, including along Rock Creek and the Bull River. During part of her tenure with the Coalition, Knudsen worked as a river planning and policy director and has an especially strong interest in the region's water quality and bull trout habitat.

21.    Earthworks member Bonnie Gestring has spent several decades working to protect the Cabinet Mountains Wilderness and its waters and wildlife from the adverse impacts of harmful mining exploration activities. Gestring recreates extensively in the region and has hiked and backpacked in the Cabinet Mountains for over 20 years. She has also authored several papers on the impacts of hardrock mining on water quality and has a scientific interest in protecting the region's waters. Gestring considers visiting these rivers and streams an

12

essential part of her wilderness experience and particularly enjoys seeing the top predator of the waters, bull trout.

22.    Longtime MEIC member John Cleveland owns land (through the corporation founded by his family in 1901) directly downstream of the project area, including Montanore's wastewater treatment facility, on Libby Creek. Cleveland has visited the property and the region regularly for over 50 years to manage the property and for recreational purposes, including fishing, hunting, hiking, and observing wildlife—especially native species such as grizzly bears and bull trout. Cleveland's company also has domestic water rights for Libby Creek, which he relies on for household purposes and drinking water.

23.    Save Our Cabinets member and co-founder, Mary Costello, lives in Sanders County, Montana and has a strong recreational, scientific, and aesthetic interest in the Cabinet Mountains—specifically in the area surrounding the project. Costello enjoys hiking and searching for native fish and wildlife and is dedicated to ensuring their healthy populations. She spends time documenting bull trout and grizzly bears through photographs and official survey lists. Through her work, Costello has spent substantial time and resources assisting the

13

public in understanding the impacts of Montanore's planned mining activities.

24.   Yaak Valley Forest Council member and Interim Executive Director, Anthony South, has been visiting the Cabinet Mountains Wilderness, Kootenai National Forest, and the region surrounding the project area since he was a young child. While his interest in the region started out purely recreational, with frequent hiking and camping trips at a young age, it has since evolved into his life's work. He and the other staff members of the Forest Council work hard to prevent habitat fragmentation and water pollution in the region. South also has a particular interest in seeing grizzly bears in the Cabinet Mountains and recalls his first-ever grizzly encounter was in the Williams Creek drainage, close to the project site.

25.   The aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of Plaintiffs and their members, staff, and volunteers have been, are being, and unless their requested relief is granted, will continue to be, adversely and irreparably injured by Defendants' failure to comply with federal law. These are actual, concrete injuries that are traceable to Defendants'

14

actions and would be redressed by the requested relief. Plaintiffs have no adequate remedy at law.

26.    Defendant U.S. Forest Service is an agency of the United States Department of Agriculture and is responsible for the management and protection of the Cabinet Mountains Wilderness and Kootenai National Forest. In that capacity, the Forest Service authorized Montanore's exploration project and must ensure the project's compliance with the ESA, NEPA, NFMA, and other applicable laws.

27.    Defendant Tom Schultz is the Chief of the U.S. Forest Service. In that capacity, Defendant Schultz has supervisory responsibility over the Forest Service's management of national forest lands, including the Kootenai National Forest, and the Forest Service's compliance with the ESA, NEPA, and NFMA requirements. Defendant Schultz is sued in his official capacity.

28.    Defendant Chad Benson is the United States Forest Service Supervisor for the Kootenai National Forest, in which the environmental impacts at issue in this lawsuit will occur. Defendant

Benson signed the decision notice approving the project and is sued in his official capacity.

29.   Defendant U.S. Fish and Wildlife Service is an agency of the United States Department of Interior and is responsible for administering the provisions of the ESA with regards to freshwater aquatic and terrestrial species, including bull trout and grizzly bears. FWS concurred with the Forest Service's arbitrary and unlawful aquatic and terrestrial BAs concluding under the ESA that Montanore's project is not likely to adversely affect threatened bull trout, grizzly bears, or their important habitat.

30.   Defendant Brian Nesvik is the Director of the U.S. Fish and Wildlife Service. In that capacity, Defendant Nesvik has supervisory responsibility over FWS and FWS's administration of the ESA. Defendant Nesvik is sued in his official capacity.

## LEGAL BACKGROUND

### I.   THE ESA

31.   The ESA "is not simply a procedural safeguard" but implements a substantive "legislative mandate 'to require agencies to afford first priority to the declared national policy of saving endangered

16

species.'" *Rock Creek Alliance v. U.S. Fish & Wildlife Serv.*, 390 F. Supp. 2d 993, 1003 (D. Mont. 2005) (quoting *Tenn. Valley Auth. v. Hill,* 437 U.S. 153, 185 (1978)). Indeed, the statute is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth.*, 437 U.S. at 180. It is intended "to halt and reverse the trend toward species extinction, whatever the cost." *Id.* at 184.

32.    The ESA requires each federal agency, "in consultation with and with the assistance of" FWS, to "insure that any action authorized … by such agency … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of such species' critical habitat. 16 U.S.C § 1536(a)(2).

33.    For any agency action that may affect any listed species or critical habitat, the action agency—here, the Forest Service—must engage in formal or informal consultation with FWS. 50 C.F.R. §§ 402.13, 402.14. To stop at informal consultation—as the Forest Service and FWS did here with the Forest Service's aquatic and terrestrial BAs and FWS' concurrence—the action agency must

17

determine, with FWS' written concurrence, that the action is not likely to adversely affect listed species or critical habitat. *Id.* § 402.13(a), (c); *see also id.* § 402.12(a), (j).

34. If the action is likely to adversely affect listed species or critical habitat, the action agency and FWS must engage in formal consultation. *Id.* § 402.14(a), (b)(1). In formal consultation, FWS must, in a biological opinion, determine whether the action is likely to result in jeopardy or destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(g)–(i), (m). If FWS determines in its biological opinion that the action is likely to jeopardize the species or result in the destruction or adverse modification of critical habitat, FWS "shall suggest those reasonable and prudent alternatives which [it] believes" would not result in jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3)(A).

35. Throughout the consultation process, the action agency and FWS "shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2).

36. FWS has an independent obligation under the ESA to ensure that actions that other federal agencies authorize will not jeopardize

listed species or destroy or adversely modify their critical habitat. *Id*.

Relying on an action agency's arbitrary or unlawful BA violates this

duty.

37.    The action agency must reinitiate consultation with FWS if

"new information reveals effects of the action that may affect listed

species or critical habitat in a manner or to an extent not previously

considered." 50 C.F.R. § 402.16(a)(2).

## II.    NEPA

38.    Congress enacted NEPA to, among other things, "declare a

national policy which will encourage productive and enjoyable harmony

between man and his environment; [and] to promote efforts which will

prevent or eliminate damage to the environment and biosphere and

stimulate the health and welfare of man." 42 U.S.C. § 4321. As a

general matter, NEPA requires that federal agencies analyze and

disclose to the public the environmental impacts of their actions. *Id*.

§ 4332(2)(C).

39.    Under NEPA, a federal agency approving a project must

undertake a thorough analysis constituting a hard look at the

environmental consequences of the project. *350 Montana v. Haaland*, 50

19

F.4th 1254, 1265 (9th Cir. 2022); *see also Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. CV 23-110-M-DWM, 2025 WL 3549515, at **2 (D. Mont. Dec. 11, 2025) ("*CBD (Dec. 2025)*"). In taking this "hard look," among other things, an agency's "assessment of baseline conditions 'must be based on accurate information and defensible reasoning.'" *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. 23-2882, 2025 WL 586358, at *4 (9th Cir. Feb. 24, 2025) ("*CBD (Feb. 2025)*") (citation omitted). This "hard look" review helps ensure "that environmental concerns [will] be integrated into the very process of agency decision-making." *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979).

40.   NEPA requires federal agencies to determine whether a major federal action will have a "reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1). If an agency, such as the Forest Service, determines the action will have significant effect, it must prepare an EIS. *Id.* § 4336(b)(1). If the Forest Service determines the action will not have significant effect, it still must provide the "basis" of that determination and prepare an EA. *Id.* § 4336(b)(2).

41.    The Forest Service violates NEPA's hard look requirement if its EA fails to "provide a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of its actions. *350 Montana*, 50 F.4th at 1265 (quotations and citation omitted). The Forest Service also violates NEPA if it "fail[s] to provide a convincing statement of reasons to explain why [a] project's impacts are insignificant" such that the agency need not prepare an EIS. *Id.* at 1259 (quotations and citation omitted).

## III.   NFMA

42.    NFMA governs the Forest Service's management of national forests through a two-step process. Under NFMA, the Forest Service is first required to develop a forest plan governing future management of the entire forest. 16 U.S.C. § 1604(a); *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1061 (9th Cir. 2002) (citing 36 C.F.R. § 219.10(a), (b)). Each forest plan (including any associated amendments) establishes management direction for resources, uses, and protective measures through desired conditions, standards, guidelines, suitability of lands, goals, and objectives for that forest. 36 C.F.R. § 219.7(e)(1). Second, the Forest Service must then manage the

forest in compliance with the forest plan and ensure that all site-specific projects within each forest are consistent with the relevant plan. 16 U.S.C. § 1604(i); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

43. The Kootenai National Forest's current forest plan was approved in 2015. The forest plan includes the 2011 Amendments for Motorized Access within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones ("Access Amendment"). The Access Amendment's standards apply to all future site-specific decisions in the Selkirk and Cabinet-Yaak grizzly bear recovery zones within the Kootenai, Lolo, and Idaho Panhandle National Forests. All Forest Service project approval documents must demonstrate substantive compliance with forest plan standards, such as the ones set forth in the Access Amendment. 36 C.F.R. §219.15(d)(2); *see also CBD (Feb. 2025)*, at *4.

**GENERAL FACTUAL BACKGROUND**

44. Montanore plans to expand industrial activity to conduct mineral exploration under the Kootenai National Forest and the Cabinet Mountains Wilderness. Montanore's project would occur over 16 years and first consist of two years of dewatering and subsequent

22

rehabilitation of approximately 7,000 feet of the existing adit. Following dewatering, construction and exploration would last up to six years, extending the current adit further under the Wilderness by approximately 4,200 feet and constructing lateral drifts. Montanore would conduct mineral exploration from approximately 35 underground drill stations located in drifts above the mineralized zone.

45. This large-scale industrial operation would disturb a remote area of northwest Montana characterized by pristine expanses of glaciated peaks, forested valleys, and rivers and streams that are among the top five percent purest waters in the continental United States. The affected area is one of the last remaining undeveloped habitats for the region's imperiled populations of bull trout and grizzly bears. Montanore's project could irreparably harm these irreplaceable ecosystems and species.

46. Montanore's parent company, Hecla Mining Co. ("Hecla"), has a history of violating environmental laws at its other mining operations. Hecla has routinely violated environmental laws at its Greens Creek mine in Alaska and its Lucky Friday mine in Idaho. As of February 2025, when Plaintiffs submitted their comments on

Montanore's project to the Forest Service, the U.S. Environmental

Protection Agency's ("EPA's") compliance webpage for the Greens Creek

mine showed Clean Water Act noncompliance for twelve out of the

twelve previous quarters. As of February 2025, EPA's compliance

webpage for the Lucky Friday mine showed Clean Water Act

noncompliance for ten out of the twelve previous quarters. Further, as

of February 2025, the Greens Creek mine had violated the Safe

Drinking Water Act in eight of the previous twelve quarters—including

four quarters with significant noncompliance—and significantly

violated the Resource Conservation and Recovery Act ("RCRA") in eight

of the previous twelve quarters. Despite this documented

noncompliance, the Forest Service did not evaluate the company's

history of violations when declining to prepare an EIS—even though the

Service's FONSI purported to address whether there were effects that

would violate environmental laws. *See* U.S. Forest Serv., *Decision

Notice and Finding of No Significant Impact for the Libby Exploration

Project*, at 12 (Oct. 2025) [hereinafter FONSI].

47.    Approval of Montanore's project constitutes a major federal

action under NEPA, and as such the Forest Service conducted an EA of

24

the project's impacts. The Forest Service finalized its EA in October 2025.

48.    The Forest Service also conducted informal consultation with FWS to evaluate the project's impacts on species protected under the ESA and their important habitat. As part of this informal consultation, in December 2024, the Forest Service sent its aquatic and terrestrial BAs to FWS for concurrence, as required by the ESA. The October 2024 aquatic BA and December 2024 terrestrial BA determined that the project "may affect" but is "not likely to adversely affect" threatened bull trout, grizzly bears, or these species' important habitat. Kootenai National Forest, *Biological Assessment for Threatened, Endangered, and Proposed Aquatic Species and Designated Aquatic Critical Habit on the Montanore Minerals Corp. Libby Exploration Project*, at 1 (Oct. 24, 2024) [hereinafter Aquatic BA]; Kootenai National Forest, *Biological Assessment of Federally Listed Terrestrial Wildlife Species for the Libby Exploration Project,* at 60 (Dec. 2024) [hereinafter Terrestrial BA]. FWS concurred with these conclusions in a February 28, 2025 letter. FWS, Ltr. from A. Bass to C. Benson (Feb, 28, 2025) [hereinafter FWS Concurrence].

49.   On October 3, 2025, the Forest Service issued its decision notice and FONSI approving Montanore's project and concluding that no EIS was necessary because the project would not significantly impact the human environment. The Forest Service's approval relied on the Service's analysis and conclusions in the EA, FONSI, terrestrial and aquatic BAs, and FWS concurrence.

**FACTS RELATED TO BULL TROUT CLAIMS**

## I.   BULL TROUT STATUS

50.   Bull trout (*Salvelinus confluentus*) are olive or drab in overall color but have striking pale orange, round spots along their sides. Their common length is twenty-five inches, though some bull trout grow to be forty inches long.[1] The species has specific habitat requirements: cold, clean, complex, and connected habitat. *Id. See also* Aquatic BA at 20–21. These habitat requirements make bull trout uniquely vulnerable to environmental disturbance.

51.   In 1999, FWS listed bull trout within the coterminous United States as threatened under the ESA. *Endangered and*

---

[1] FWS, *Bull Trout*, FWS.gov, https://www.fws.gov/species/bull-trout-salvelinus-confluentus (last visited Mar. 26, 2026).

*Threatened Wildlife and Plants; Determination of Threatened Status for Bull Trout in the Coterminous United States*, 64 Fed. Reg. 58,910 (Nov. 1, 1999). Bull trout are threatened by the combined effects of, among other things, poor water quality and habitat degradation and fragmentation caused by mining and dewatering. *Id.*

52.    In the area of Montanore's exploration project, streams on the east side of the Cabinet Mountains flow to the Kootenai River in the "Kootenai River Core Area." Aquatic BA at 22. FWS' 2014 biological opinion covering the previous proposal for Montanore's mine noted that the status of bull trout in this core area "'is tied to a few spawning and rearing streams.'" *Save Our Cabinets*, 255 F. Supp. 3d at 1049 (citation omitted). Since 1995, the core area has experienced a declining trend in numbers of bull trout redds (egg nests). Aquatic BA at 23.

53.    One important stream in the Kootenai River Core Area is Libby Creek—into which Montanore discharges (and will discharge) the effluent from its water treatment plant. Aquatic BA at 42. In the portion of the Kootenai River Core Area that would potentially be affected by Montanore's exploration project, bull trout regularly spawn in only two stream reaches. *Id.* at 22. One of those two reaches is the

27

portion of Libby Creek that Montanore's effluent is discharged into down to a barrier falls. *Id.* This segment of Libby Creek is designated bull trout critical habitat and, given the natural fish barrier created by the falls, sustains an isolated population of the species. *Id.* at 25, fig. 5. FWS' 2014 biological opinion stated that this segment of Libby Creek "has numerous [bull trout] spawning areas." Ex. 2, FWS, *Final Biological Opinion on the Effects to Bull Trout and Bull Trout Critical Habitat From the Implementation of Proposed Actions Associated with the Plan of Operations for the Montanore Minerals Corporation Copper/Silver Mine,* at 124 (Mar. 31, 2014) (excerpted) [hereinafter 2014 BiOp].

## II.    THE FUNDAMENTALLY FLAWED AQUATIC BA AND FWS' CONCURRENCE

54.    The Forest Service issued its aquatic BA on October 24, 2024. In the BA, the Service determined that Montanore's exploration project "may affect" but is "not likely to adversely affect" threatened bull trout and their critical habitat. Aquatic BA at 51.

55.    In the aquatic BA, the Forest Service failed to rationally and lawfully evaluate the impacts of Montanore's project on bull trout in Libby Creek. For example, the Service failed to rationally and lawfully

evaluate the impacts to the creek's bull trout from the elevated temperatures and nitrogen levels of the effluent from Montanore's water treatment plant.

56. Montanore's existing mine adit is currently flooded. *See id.* at 5. To maintain the flooding at a constant level, Montanore pumps water to its water treatment plant on the surface. *Id.* at 4. Treated water flows to a percolation pond, which is labeled Outfall 001. *Id.* at 7. From Outfall 001, the effluent discharges to groundwater, which flows into Libby Creek. *Id.* at 42.

57. Montanore's exploration project would dewater the adit, which would more than quadruple the average discharge rates to the water treatment plant, from 30 to 135 gallons per minute ("gpm"). *See* EA at 2-3, 2-11. In a three- to four-week period during initial dewatering, average rates exceeding 135 gpm (but "within the 500 gpm capacity" of the treatment plant) may occur. *Id.* at 2-11.

Elevated Temperatures

58. The Forest Service based its conclusion that the elevated temperatures of the water treatment plant's effluent are not likely to adversely affect Libby Creek's bull trout on the following: (1) the

"maximum effluent temperature has been within the tolerance range for bull trout;" (2) "[e]ffluent temperature may be slightly cooler when the adit is extended;" (3) "[i]nstream temperatures downstream of the project area have been below the spawning temperature threshold during the spawning season;" and (4) "[d]ifferences in instream temperatures upstream and downstream of the project area before and after discharge began were similar." Aquatic BA at 46–47.

59.    In reaching its conclusion that the effluent's elevated temperatures are not likely to adversely affect Libby Creek's bull trout, the Forest Service failed to consider several important aspects of the problem regarding potential temperature changes. These failures also show that the Service failed to use the best available science.

60.    <u>First</u>, for example, the Forest Service failed to consider that recent effluent temperatures have been—and future effluent temperatures are predicted to be—higher than the tolerance range for bull trout. Although the Forest Service stated that maximum effluent temperature from the water treatment plant was 58.6 degrees Fahrenheit ("F") based on data from 2008 to 2019, Aquatic BA at 45–46, the 2024 draft Montana Pollution Discharge Elimination System

("MPDES") permit for the project identified the actual maximum daily summer effluent temperature from June 2017 to October 2020 as 16.7 degrees Celsius ("C") (62.06 degrees F)—and estimated future maximum daily winter and summer effluent temperatures of 16.7 degrees C and 16.8 degrees C (62.26 degrees F) during exploration. MDEQ, *MPDES Fact Sheet, Libby Exploration Project,* at tbl. A.1 (2024). These temperatures exceed the 59 degree F threshold that the Forest Service recognized as the upper limit for adult bull trout holding habitat. Aquatic BA at 45. They also greatly exceed the 48 degree F threshold that the Service recognized as the upper limit for spawning and rearing habitats. *Id.* at 21, 45 (discussing riparian management objective from the Forest Service's 1995 Inland Native Fish Strategy); *see also id.* at 46 (describing 48 degrees F as a "spawning threshold").

61.    The Forest Service failed to address that, as noted above, exploration activities will result in high discharge rates for this warm effluent. These high discharge rates will increase the warm effluent's harmful effects on Libby Creek's bull trout.

62.    Second, the Forest Service failed to address the stream-temperature effects of a seasonally dry section of Libby Creek upstream

31

and downstream of Outfall 001. In early August 2021, there was a 548-foot dry stretch of the creek, which the Service referred to as being "[s]easonally [d]ry." Aquatic BA at 25, figs. 8–9. Side channels in this section were also dry, and a gauge between Outfall 001 and the barrier falls (downstream of the outfall) read only 0.5 feet on August 8, 2021. *Id.* at 25–26, fig. 9.

63.    Thus, there could be times during late summer (when bull trout are preparing to spawn, and fry[2] and juvenile bull trout are present) and fall (during spawning, and when fry and juvenile bull trout are also present) that the only water in this stretch of Libby Creek is the effluent. The effluent clearly exceeds the 48 degree F threshold that the BA recognized for spawning and rearing habitats and at times even exceeds the 59 degree F threshold that the Forest Service recognized for adult bull trout. *Id.* at 45. Bull trout spawn between late August and early November, and the aquatic BA also indicated that spawning in the action area likely occurs in October and November. *Id.* at 18, tbl. 7. Rearing occurs in all months of the year. *See id.* at tbl. 7 (listing March through October as months that fry bull trout are present in the action

---

[2] Fry are recently hatched fish.

area and listing juvenile bull trout as present all twelve months of the year).

64. Even if Libby Creek were not dry in a particular year, the lower the flows, the greater the negative impact of warm water from Outfall 001 could be on spawning, fry, juvenile, and adult bull trout. Despite this, the Forest Service failed to address the problem of Libby Creek's seasonally dry stretch.

65. Third, the Forest Service failed to consider how effluent temperatures would affect rearing bull trout. As noted above, the Service recognized that bull trout need stream temperatures lower than 48 degrees F for spawning and rearing. Similarly, FWS' 2014 biological opinion covering the previous proposal for the Montanore Libby mine stated that "optimum water temperatures for juvenile rearing range from about 46 to 50 degrees F." 2014 BiOp at 32. Relying on data from 2009 and 2017 showing Libby Creek temperatures below 48 degrees F after mid-September, the Service asserted in its aquatic BA that temperatures have been "below the spawning temperature threshold during the spawning season." Aquatic BA at 46–47. The Service, however, did not analyze how the warm water from Outfall 001 would

affect rearing bull trout, especially during warmer months when stream temperatures will be higher. As noted above, rearing occurs in all months of the year, including the warmer summer months.

66. <u>Fourth</u>, in its analysis of the project's effect on Libby Creek's temperatures, the Forest Service failed to take into account the effects of climate change on the creek's temperatures and bull trout. The Service did so despite acknowledging, while discussing climate change in the context of the environmental baseline, that (a) climate change has already increased air temperatures; (b) the "effects of climate change on streams in the Action Area are likely to include increased stream temperature and earlier timing of peak streamflow"; and (c) "[i]ncreasing stream temperature during this century does … appear likely and it is reasonable to conclude that this will decrease the amount of available bull trout habitat in the Action Area." Aquatic BA at 34–36. Put differently, the Service failed to address how the project's discharges of warm effluent might compound climate change's effects on Libby Creek temperatures and bull trout, and vice versa.

67. <u>Fifth</u>, the Forest Service failed to analyze Libby Creek temperatures recorded after 2019, despite acknowledging, as noted

above, that climate change has already increased air temperatures and that the "effects of climate change on streams in the Action Area are likely to include increased stream temperature." Aquatic BA at 34, 36. Regarding water temperatures in the general area of the project, the Service, citing to studies published in 2019 and earlier, stated both that "length of the study periods might have been insufficient to detect changes" and that "it is possible that these streams have not warmed appreciably despite warming air temperatures." *Id.* at 35. The most recent Libby Creek temperature data that the Service discussed are from 2009 and 2017, which the Service cited for the limited proposition that temperatures were "lower than the 48°F spawning threshold after mid-September." *Id.* at 46.

68.    Because climate change is projected to progressively increase water temperatures and could have raised Libby Creek's temperatures in the past six years, it was irrational for the Service to rely on stale measurements in its temperature analysis. It was especially egregious for the Forest Service to fail to consider more recent stream temperature data given that, as discussed above, Montanore's recent

35

draft MPDES permit showed that effluent temperatures have been higher than those the Service considered in the aquatic BA.

Elevated Nitrogen Levels

69.    The Forest Service also failed to rationally and lawfully evaluate the impacts to Libby Creek's bull trout from the elevated nitrogen levels in the effluent from Montanore's water treatment plant. In particular, the effluent—and, as a result, Libby Creek—will contain much higher levels of nitrogen than the levels the Service considered in the aquatic BA.

70.    In the aquatic BA, the Forest Service recognized that Montanore's project will increase nutrient concentrations in Libby Creek. Aquatic BA at 44. The Service, however, concluded: "Due to the existing low nutrient concentrations in Libby Creek and the requirements that discharge limits be modified if necessary to protect beneficial uses, the potential for nutrient increases … to affect bull trout or bull trout critical habitat is negligible." *Id.* at 45. The Service asserted that, "[u]nless [Montanore] requested and [Montana Department of Environmental Quality ("MDEQ")] approved a variance request for the total nitrogen standard, MDEQ would set a total

36

nitrogen effluent limit to meet the standard of [275 µg/L] during $7Q_{10}$ flow"[3]—and that "[i]ncreases in algal growth may not occur in response to an increased total nitrogen concentration to [275 µg/L]." Aquatic BA at 44–45. As the Forest Service acknowledged, Montanore's current MPDES permit, issued in 2006, will soon be replaced. EA, Appendix E – Response to Comments at 64.

71.   In the final EA, which the Forest Service issued almost a year after its aquatic BA, the Service admitted that Montanore's project will increase total nitrogen concentrations to levels far higher than those discussed in the BA—listing a maximum total nitrogen concentration of 3,460 µg/L in Montanore's effluent. EA at 3-24. The Forest Service's EA presumably pulled this concentration from Montanore's 2023 mixing zone application submitted to Montana as part of the company's application for a new MPDES permit, since (a) the mixing zone application listed the 3,460 µg/L concentration and (b) the EA elsewhere relied on the mixing zone application. Hydrometrics,

---

[3] "$7Q_{10}$" stands for 7-day, 10-year. EA at v. The aquatic BA uses "0.275 mg/L" instead of 275 µg/L, but the two are equivalent.

*Application for Mixing Zone in Groundwater and Surface Water* (June 2023) at 13-5, 14-3; EA at 3-24–3-25.

72.   Because Montanore's mixing zone application was from 2023, it was available to the Forest Service at the time of the October 2024 aquatic BA.

73.   The mixing zone application also listed a maximum total nitrogen concentration of 3,142 µg/L after full mixing with groundwater, as well as a nitrogen level of 953 µg/L in Libby Creek at the end of an over-half-mile mixing zone. Hydrometrics (June 2023) at 14-3, 15-3.

74.   In other words, the nitrogen concentrations—listed by Montanore in 2023—at the end of the Libby Creek mixing zone are nearly three and a half times the 275 µg/L concentration that the Forest Service assumed in the 2024 aquatic BA. And the treatment plant's expected discharges, even after full mixing with groundwater, are over an order of magnitude higher than the concentration discussed in the BA.

75.   The Forest Service failed to consider these much higher total nitrogen concentrations or their effect on Libby Creek's bull trout in the

aquatic BA. In failing to consider these higher nitrogen concentrations, the Forest Service also failed to use the best available scientific data.

FWS' Concurrence

76.   In a February 28, 2025 letter to the Forest Service, FWS concurred with the aquatic BA's determinations that Montanore's exploration project "may affect" but is "not likely to adversely affect" bull trout and their critical habitat. The concurrence contained no independent analysis of the temperature or nitrogen effects of exploration activities, stating only: "The discharge of treated water into Libby Creek will comply with Montana Pollutant Discharge Elimination System permit levels, therefore concentrations of … nutrients[] and temperature would remain within levels that are protective of aquatic life." FWS Concurrence at 4.

## III.   MONTANA REPEALED ITS NUMERIC NITROGEN STANDARD AFTER FWS' CONCURRENCE

77.   Two months after FWS' concurrence, on May 1, 2025, Montana's governor signed a bill eliminating numeric criteria from Montana's nutrient water quality standards, including the 275 µg/L total nitrogen standard that the Forest Service relied upon in its aquatic BA to assert that "MDEQ would set a total nitrogen effluent

limit to meet the standard of [275 µg/L]." Aquatic BA at 44. Montana's revision repealed numeric nutrient criteria found in Department Circular 12-A, which included the total nitrogen standard of 275 µg/L.

78.    With the repeal of numeric nutrient criteria, only a general narrative standard from ARM 17.30.637(1)(d)-(e) applies. The general narrative standard from ARM 17.30.637(1) provides in relevant part: "State surface waters must be free from substances attributable to … industrial … practices or other discharges that will: …(d) create concentrations or combinations of materials which are toxic or harmful to human, animal, plant, or aquatic life; and (e) create conditions which produce undesirable aquatic life."

79.    Through an October 3, 2025 letter, EPA approved Montana's elimination of numeric criteria from its nutrient water quality standards. EPA, Ltr. from C. Western to S. Nowakowski (Oct. 3, 2025) (attached as Exhibit 2 to Ex. 1, Notice of Intent to Sue) (also available at https://www.epa.gov/system/files/documents/2025-10/2025-mt-hb664-approval.pdf).

80.    The Forest Service did not reinitiate ESA consultation with FWS regarding the repealed numeric nitrogen standard of 275 µg/L—

40

despite, in the BA, relying on the assumption that the numeric standard would apply and reasoning that "[i]ncreases in algal growth may not occur in response to an increased total nitrogen concentration to [275 µg/L]." Aquatic BA at 44–45.

## IV.   THE FOREST SERVICE'S BULL TROUT ASSERTIONS FROM THE EA

81.   In the EA, the Forest Service cited the aquatic BA for the conclusion that Montanore's project "may affect, but is not likely to adversely affect bull trout and designated bull trout critical habitat." EA at 3-56–3-57. The EA repeated the Service's same conclusions from the aquatic BA regarding the expected temperature and nitrogen effects on Libby Creek's bull trout. *Id.* Although the EA—unlike the BA—discussed the high nitrogen levels from Montanore's mixing zone application (as noted above and below), that discussion was in a separate section of the EA focused on impacts to water quality—not bull trout. *Id.* at 3-24–3-25.

## FACTS RELATED TO GRIZZLY BEAR CLAIMS

## I.   GRIZZLY BEAR STATUS

82.   The grizzly bear (*Ursus arctos horribilis*) once numbered roughly 50,000 individuals across the western United States. *Crow*

41

*Indian Tribe v. United States*, 343 F. Supp. 3d 999, 1004 (D. Mont. 2018) (quotation omitted), *aff'd in part, rev'd in part, and remanded*, 965 F.3d 662 (9th Cir. 2020). However, with European American settlement, grizzlies were "shot, poisoned, and trapped wherever they were found," eliminating them except for a few isolated mountain populations. *Id.* In 1975, recognizing the grizzly bear's imperiled status, FWS listed them under the ESA as a threatened species throughout the lower 48 United States. *Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species*, 40 Fed. Reg. 31,734 (July 28, 1975).

83.     The Cabinet-Yaak Ecosystem is one of six recovery zones established for conservation and recovery of grizzly bears, five of which are located in the Northern Rockies region. Dr. Christopher Servheen, *Grizzly Bear Recovery Plan*, at 15 (Jan. 29, 1982) [hereinafter Recovery Plan]. FWS also established recovery targets for each, including population sizes and mortality limits. *Id.* at 19. FWS has stated its goal is "to recover grizzly bear populations in all of the[se] ecosystems." *Id.* at 15.

84.    Due to low resiliency and the low number of bears, the Cabinet-Yaak population of grizzly bears is the most vulnerable population of grizzlies in the contiguous United States, with rough estimates indicating just 70 bears in 2024. FWS, *Species Status Assessment for the Grizzly Bear (Ursus arctos horribilis) in the Lower-48 States* at 68, 238 (Oct. 28, 2024) [hereinafter 2024 SSA]. But for translocations of bears from other ecosystems, the Cabinet Mountains population would likely be extinct. Wayne F. Kasworm et al., *Cabinet-Yaak Grizzly Bear Recovery Area 2024 Research and Monitoring Progress Report*, at 5 (Aug. 2025). This population faces numerous stressors and, in current conditions, has been unable to meet FWS's recovery targets. *Id.* at 17.

85.    The approved project is located within the St. Paul Bear Management Unit ("BMU 5") and partially within the Cabinet-Face Bears Outside Recovery Zone ("BORZ"). FWS Concurrence at 4. Both male and female grizzly bears have been observed in BMU 5 and the BORZ, and the Forest Service acknowledged that female grizzly bears may be present during Montanore's exploration activities. *Id.*

43

## II.   THE FOREST SERVICE'S FLAWED TERRESTRIAL BA AND FWS' CONCURRENCE

86.   Despite the already precarious condition of the Cabinet-Yaak grizzly bear population, the Forest Service determined in its December 2024 terrestrial BA that the project "may affect" but is "not likely to adversely affect" grizzly bears and their important habitat. Terrestrial BA at 60. However, that determination was arbitrary and unlawful. For example, in the BA, the Forest Service failed to rationally address several crucial factors in its analysis of impacts, including the baseline condition of the Cabinet-Yaak grizzly bear population, connectivity, and impacts on grizzly core habitat.

Existing Baseline

87.   First, for example, the Forest Service failed to acknowledge or contend with the existing precarious condition of the Cabinet-Yaak grizzly bear population. According to FWS's own metrics and reports, the Cabinet-Yaak population is currently not meeting any of its recovery targets. 2024 SSA at 93–95. To ensure a population not fewer than 100 bears, FWS' 1982 Recovery Plan established a target of at least six females with cubs in the Cabinet-Yaak Ecosystem. Recovery Plan at 19, 33. To ensure adequate distribution of family groups, the

44

Recovery Plan set a goal that females with cubs occupy eighteen of twenty-two BMUs. *Id.* at 20, 33. To facilitate recovery and account for unknown, unreported mortalities, the Recovery Plan also set a general limit on bear mortality at 4% of the population estimate, of which only 30% of those mortalities can be females. *Id.* at 20–21, 33. Finally, because the Cabinet-Yaak population of grizzly bears is so small, the Recovery Plan set the target of human-caused mortalities at zero. *Id.* at 33.

88.     As of 2024, on average the Cabinet-Yaak population recorded just 3.5 female bears with cubs per year from 2019–2024; only sixteen of twenty-two BMUs were occupied by females with cubs; and the general mortality rate was 4.2%, with more than 30% of those mortalities female. Kasworm et al. (2025) at 17, 20. Further, the Cabinet-Yaak population sustained four known human-caused mortalities in 2024 alone. *Id.* at 20. In sum, the Cabinet-Yaak population failed to meet all FWS recovery targets.

89.     The Forest Service did not consider or even acknowledge the precarious status of the Cabinet-Yaak population when evaluating the project's impacts on grizzly bears. When referring to the status of

grizzly bears, the Forest Service's baseline analysis only cited to the outdated 2022 SSA rather than the best available science—the 2024 SSA—with no justification. Terrestrial BA at 42. The outdated 2022 SSA included significantly more optimistic population data, including more female bears with cubs, a lower human-caused mortality rate, and fewer human-caused mortalities overall. FWS, *Species Status Assessment for the Grizzly Bear (Ursus arctos horribilis) in the Lower-48 States,* at 94 (Jan. 21, 2022). The best available science, the 2024 SSA, reflects a significantly more precarious grizzly population in the Cabinet-Yaak Ecosystem. 2024 SSA at 93–95.

90.    Second, in calculating baseline road density, the Forest Service failed to adequately consider illegal road use. Motorized access is a crucial factor in making road density calculations to ensure compliance with forest plan standards, and the Forest Service's "not likely to adversely affect" conclusion relied on such standards being satisfied. *CBD (Feb. 2025),* at *3; Terrestrial BA at 61.

91.    Though the project introduces no new roads, the Forest Service relied on existing road densities without considering the record data showing that a significant percentage of road closures in or near

46

the project area are ineffective. Terrestrial BA at 47. These ineffective road closures contribute to greater on-the-ground road impacts—and thus a more stressed grizzly bear population—not included in the baseline analysis.

92. The Forest Service utilized two road density metrics, Open Motorized Route Density ("OMRD")—accounting for "open roads, other roads not meeting all restricted or obliterated criteria[,] and open motorized trails"—and Total Motorized Route Density ("TMRD")—accounting for "open roads, restricted roads, roads not meeting all reclaimed criteria[,] and open motorized trails." Terrestrial BA at 46. Importantly, the Forest Service's calculations of these baseline road densities failed to include illegal road use, and the densities for the Kootenai National Forest are near maximum limits from the forest plan standards. *Id.* The Forest Service listed current OMRD and TMRD conditions as twenty-seven and twenty-one percent, respectively, which ostensibly satisfy the forest plan standards of 30 and 23 percent. *Id.* Without accurately accounting for illegal road use, however, the Forest Service's assertion that current conditions meet forest plan standards for road density is unreliable.

47

93.    The Forest Service claimed to have considered the "influence" of unauthorized motorized use in describing existing conditions. *Id.* at 47. However, this vague mention of illegal road use does not constitute a rational evaluation of the current condition of grizzly bears in the project area, which is needed to adequately evaluate the project's effects on grizzly bears overall. *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. CV 22-91-M-DLC, 2025 WL 3268655, at *10 (D. Mont. Nov. 24, 2025) ("*CBD (Nov. 2025)*") (ruling that excluding unauthorized road use from road density calculations is arbitrary under the ESA).

Connectivity

94.    Additionally, in its analysis of the project's effects, the Forest Service failed to consider connectivity between grizzly bear subpopulations within the Northern Rockies' five recovery areas—a demographic factor that FWS' 2024 SSA highlighted as "important to resiliency of an ecosystem" and crucial to avoiding genetic fragmentation of grizzlies. 2024 SSA at 103. Small and isolated grizzly bear populations are vulnerable to extinction, and lack of connectivity can also cause low genetic diversity, genetic drift, and inbreeding. *Id.* at

48

184. Connectivity between the Cabinet-Yaak Ecosystem and other grizzly populations is necessary for the population to be resilient and recover. In particular, the Cabinet population of bears is more isolated and only precariously connected to the Yaak population to the north. 2024 SSA at 193–194. The SSA specifically identified the southeastern front of the Cabinet Mountains—not far from the project location—as an important and high value connectivity pathway for Cabinet-Yaak grizzly bears to connect with other ecosystems, such as the Northern Continental Divide Ecosystem. *Id.* at 56–57, 60, fig. 15.

95. Despite this, the terrestrial BA entirely failed to address the project's potential effects on grizzly bear connectivity despite addressing the factor for the two other listed terrestrial species affected by the project, the Canada Lynx and the North American Wolverine. Terrestrial BA at 62, 71. In the face of available data demonstrating genetic diversity problems in a grizzly population, disregarding connectivity is contrary to the best available science. *Crow Indian Tribe*, 343 F. Supp. 3d at 1018. Despite the limited connectivity of the Cabinet-Yaak population to the other grizzly subpopulations, the Forest

Service failed to even acknowledge connectivity as a factor to consider, much less analyze the project's effects on connectivity.

96.    Conspicuously, the Forest Service did not cite the current SSA, or any of its connectivity analysis, at any point in the terrestrial BA—despite issuing the terrestrial BA more than a month after FWS released the 2024 SSA. This failure to use the best available science regarding connectivity undermines the Forest Service's conclusion that the project is not likely to adversely affect grizzly bears.

Core Habitat

97.    The Forest Service also failed to consider important factors and ignored the best available science in its analysis of grizzly bear core habitat. In reaching its "not likely to adversely affect" conclusion, the Forest Service relied on the contention that existing core habitat data, including relevant road density data, are satisfying forest plan standards for BMU 5. Terrestrial BA at 61. The forest plan standard requires core habitat to be greater than or equal to 60% of the total acres in the BMU. Terrestrial BA at 61; USFS, *Kootenai National Forest Land Management Plan*, Appendix B, FW-STD-WL-02, at 146–151 (2015) [hereinafter FW-STD-WL-02]. The terrestrial BA listed

50

current conditions for core habitat at 60%, the lowest possible compliance percentage. Terrestrial BA at 45. In claiming that the core habitat standard would still be met even with Montanore's project, the Forest Service acknowledged that the project would disrupt 269 acres of core habitat. *Id.* at 56. In calculating core habitat, however, the Service failed to rationally consider habitat patch size and the impacts of unauthorized motorized use.

98.    First, in calculating total core habitat acreage, the Forest Service included patches that are insufficient to be effective secure habitat. The forest plan defines grizzly bear core habitat as areas of secure habitat that contain no motorized travel routes and are at least 500 meters from a drivable road. FW-STD-WL-02 at 110. The best available science explains that, for secure habitat to be effective, it must be an area where "an adult female grizzly bear can meet her daily foraging needs with a low probability of disturbance by people." Michael L. Gibeau et al., *Managing for Grizzly Bear Security Areas in Banff National Park and the Central Canadian Rocky Mountains*, at 126 (2001). When patches of habitat are too small, they fail to meet the essential tenets of effective secure habitat—low probability of

disturbance by people, low probability of habituation, less mortality, and in general, areas bears are less likely to avoid. *Id.*

99.    Substantial available research recommends a minimum patch size before habitat can be considered effective core habitat, with most studies recommending minimums of at least 2,224 acres. Gibeau et al. (2001) (2,224 acres minimum); Michael F. Proctor et al. *Effects of Roads and Motorized Human Access on Grizzly Bear Populations in British Columbia and Alberta, Canada* (2020) (2,471 acres minimum); 2024 SSA at 88 ("For the [Northern Continental Divide Ecosystem], we define secure core habitat as those areas…at least 2,500 acres [] in size.").

100.   While another study, which focused on the Selkirk and Cabinet-Yaak Ecosystems in Idaho and Montana, was hampered by problems including small sample sizes, the researchers there nevertheless concluded that "if a minimum size occurs, it is likely between 2 [square miles (1,280 acres)] and 8 [square miles (5,120 acres)]," and—even then—"[n]arrow strips of core habitat may fit some minimum size criterion but would likely not provide effective core habitat for bears." Wayne L. Wakkinen & Wayne F. Kasworm, *Grizzly*

52

*Bear and Road Density Relationships in the Selkirk and Cabinet-Yaak Recovery Zones*, at 1, 23 (1997).

101. Here, even taking the smallest minimum—1,280 acres— from the limited Wakkinen and Kasworm (1997) study, all but one of the twelve patches of core habitat in BMU 5 are insufficiently large for grizzly bear security. Terrestrial BA at 46. As such, 2,968 acres of purported core habitat do not comply with the minimum patch size supported by the best available science. Terrestrial BA at 46. When these 2,968 acres and the 269 acres disturbed by the project are taken out of core habitat, the remaining core habitat amounts to only 56% of the total BMU acreage, significantly below the forest plan standard.

102. Second, the Forest Service also failed to rationally account for or incorporate illegal road and trail use in its core habitat calculations. As noted above, the forest plan's definition of core habitat specifically requires that the habitat contain no motorized travel routes and be at least 500 meters from a drivable road. FW-STD-WL-02 at 110. Thus, motorized access is a crucial variable in calculating core habitat to ensure compliance with the forest plan standard and to accurately evaluate a project's impact on grizzly bears. *CBD (Feb. 2025)*, at *3.

53

Restricting motorized-vehicle access "minimiz[es] human interactions and potential grizzly bear mortality, reduc[es] displacement from important habitats, and minimiz[es] habituation to humans." *All. for the Wild Rockies v. Savage*, 897 F.3d 1025, 1034–1035 (9th Cir. 2018) (quoting Access Amendments).

103.   The Forest Service acknowledged increasing percentages of ineffective road closures within the BMU and BORZ areas—as high as 25%—despite the terrestrial BA labeling the illegal use "not frequent or chronic." Terrestrial BA at 47. However, merely acknowledging unauthorized motorized use is not sufficient. The Forest Service was required to account for these ineffective closures in its core habitat analysis because any roads in core habitat must "no longer function as a motorized route." FW-STD-WL-02 at 148. Though core habitat does not, by definition, include any gated roads, it "may contain roads that are impassable due to re-growth of vegetation, effective barriers other than gates, or placement of logging or forest debris so as to no longer function as a motorized route." *Id.* Ultimately, "by excluding illegal roads, FWS makes an 'unsupported assumption' that illegal roads have no effect on

54

grizzly bears. Such an assumption fails to 'err on the side of the bear.'"

*CBD (Nov. 2025)*, at \*9.

104. The Forest Service's "not likely to adversely affect" conclusion relied on the core habitat forest plan standard being met even with the exploration project. However, the Forest Service's failure to rationally consider these important core habitat factors, along with the connectivity and baseline issues outlined above, fundamentally undermined the agency's conclusion that the project is not likely to adversely affect grizzly bears.

FWS' Concurrence

105. Despite the terrestrial BA's numerous inadequacies, including those outlined above, FWS, in its February 28, 2025 letter, concurred with the Forest Service's "not likely to adversely affect" conclusion. FWS Concurrence at 1. In its concurrence, FWS offered no further analysis of the effects the project would have on grizzly bears and their important habitat beyond that which was offered in the Forest Service's BA. *Id.*

55

## III.   THE FOREST SERVICE'S GRIZZLY BEAR ASSERTIONS FROM THE EA

106.   In its EA, the Forest Service explicitly relied on the terrestrial BA for its conclusion that the project "may affect, [but is] not likely to adversely affect grizzly bear" and their important habitat. EA at 4-1. The Forest Service's analysis in the final EA essentially summarized and reiterated the analysis and findings from the terrestrial BA, and as such, contained numerous flaws, including those detailed above.

## FACTS RELATED TO WATER DRAWDOWN AND WATER QUALITY CLAIMS

## I.   WATER DRAWDOWN

107.   One hallmark of Montanore's exploration project is its potential impact on groundwater and surface water resources from extending the underground exploration adit. The Forest Service relied on a groundwater model prepared by a consultant (Piteau Associates) to assess groundwater impacts from Montanore's exploration activities, including drawdown of surface water. The Service also hired a third-party consultant, BGC Engineering, to opine on Piteau's groundwater model. *See* EA at 4-2. BGC observed that Piteau's model was based on data that said little about possible dewatering in the shallow

56

groundwater areas in the high mountains that would be impacted by Montanore's adit extension : "Most of the known shallow groundwater information is located distant from the adit extension, in the lower-elevation margins of the model domain … [L]ittle groundwater data are available for the shallow flow systems that interact with streams and groundwater-dependent ecosystems (GDEs) of interest in the higher mountains." BGC, *Review of Numerical Groundwater Model Approach and Construction*, at i (Feb. 5, 2024). BGC continued: "Because of the lack of data concerning the shallow flow system, <u>there is large uncertainty</u> with respect to hydraulic communication between the future adit extension and the surficial system." *Id.* (emphasis added).

108.  Despite this large uncertainty, the Forest Service, in its EA, concluded: "At the end of the proposed dewatering and at 10 and 100 years after the end of dewatering, no drawdowns within the precision of the groundwater model are predicted to occur at [GDEs], lakes, or springs." EA at 3-20. The Forest Service, however, failed to rationally evaluate the potential impacts to groundwater—and resulting impacts to surface waters—in the Cabinet Mountains Wilderness from Montanore's adit extension.

57

109. For example, although the Forest Service stated that "[n]o surface water features are within the area of the one foot of water table drawdown," *id.*, this statement is directly contradicted by multiple figures in the EA, which show two feet of water table drawdown in an area of the Wilderness that includes multiple GDEs and Lower Libby Lake. *Id.* at figs. 3-5, 3-6, 3-7.

110. As Dr. Payton Gardner explained in his response to comment rebuttal for the project (which Plaintiffs submitted to the Forest Service), this level of drawdown could destroy GDEs and potentially cause significant reduction in groundwater discharge to surface water.

111. Although Dr. Gardner pointed out the EA's inconsistency on this point in the rebuttal and an earlier report that Plaintiffs submitted with their initial comments to the Forest Service, the Service did not respond to his report or address the error.

## II.   WATER QUALITY

112. In the EA, the Forest Service also failed to rationally evaluate impacts to Libby Creek's water quality from the elevated nitrogen levels of the effluent from Montanore's water treatment plant.

58

113.   As discussed above, the Forest Service admitted in the EA that Montanore's project will increase total nitrogen concentrations in Libby Creek to levels far higher than those discussed in the BA, listing a maximum total nitrogen concentration in the effluent from Montanore's water treatment plant of 3,460 μg/L. EA at 3-24. The Service also pointed to Montanore's mixing zone application, *id.* at 3-25, which listed a nitrogen level of 953 μg/L at the end of an over-half-mile mixing zone. Hydrometrics (2023) at 15-3. The mixing zone application also listed a maximum total nitrogen concentration of 3,142 μg/L after full mixing with groundwater. *Id.* at 14-3.

114.   In the EA, the Forest Service asserted that, according to Suplee and Watson (2013),[4] total nitrogen "up to 1,210 μg/L" is protective against growth of undesirable aquatic life. EA at 3-25. The Service added: "The projected concentrations in Libby Creek are below [this] protective concentration[]; thus, the mixing zone for nitrogen … is not expected to produce undesirable aquatic life and would be in

---

[4] Suplee, M. and V. Watson, *Scientific and Technical Basis of the Numeric Nutrient Criteria for Montana's Wadeable Streams and Rivers: Update 1, Montana Department of Environmental Quality* (May 2013), available at https://deq.mt.gov/files/water/wqpb/standards/pdf/sciencetech2013fnlcom.pdf.

compliance with the existing narrative standards (General Prohibitions) in ARM 17.30.637." *Id.*

115. Although Suplee and Watson stated that some studies "[b]eyond this ecoregion" indicated a range of nitrogen criteria of 300–1,210 µg/L, the "scientific literature most specific to this ecoregion" (*i.e.*, the Northern Rockies, which includes the project area and Libby Creek) "suggests criteria ranging from … 210–400 µg TN/L." Suplee and Watson (2013) at 3-10. Ultimately, Suplee and Watson recommended total nitrogen limits of 275 µg/L for the Northern Rockies ecoregion *Id.*

116. Contrary to what the Forest Service claimed in the EA, Suplee and Watson (2013) did not state that nitrogen concentrations of 1,210 µg/L are protective for streams in this ecoregion. Montanore's listed nitrogen concentration of 953 µg/L at the end of its mixing zone is nearly three and a half times Suplee and Watson's recommended level of 275 µg/L. And the treatment plant's expected discharges up to 3,460 µg/L—and the maximum total nitrogen concentration of 3,142 µg/L after full mixing with groundwater—are over an order of magnitude higher than the recommended level.

60

## THE FOREST SERVICE'S UNLAWFUL FONSI

117. As noted above, in its October 2025 FONSI, the Forest Service concluded that no EIS was required under NEPA, as the agency claimed that Montanore's project would not significantly affect the quality of the human environment. The Forest Service's finding of no significant impact was flawed in at least two ways.

118. First, for example, the Forest Service concluded Montanore's project would result in minimal impacts to bull trout and grizzly bears. More specifically, the Service concluded that the project would have no "discernible" effects to bull trout or their critical habitat—and would have "negligible" effects to grizzly bears and their habitat. FONSI at 8–9.

119. However, Montanore's project could significantly harm Libby Creek and its bull trout, including through, as discussed above, temperature increases and increased nitrogen levels. Similarly, Montanore's project could significantly harm the area's grizzly bears and their important habitat, including through the ways discussed above.

61

120.  Second, although the Forest Service purported to address whether exploration activities would violate environmental laws, *id.* at 12, the Service failed to address the routine violations by Montanore's parent company, Hecla, at its other mining operations—despite Plaintiffs highlighting these violations in their comments to the Service. As discussed above, Hecla has repeatedly violated the Clean Water Act at its other mines in Idaho (Lucky Friday) and Alaska (Green's Creek). And, at its Alaska mine, Hecla has violated the Safe Drinking Water Act and RCRA on multiple occasions.

**FIRST CLAIM FOR RELIEF**
**(Against the Forest Service for Arbitrary and Unlawful Conclusion Under the ESA that the Project Is Not Likely to Adversely Affect Bull Trout or Their Critical Habitat)**

121.  Plaintiffs hereby reallege and reincorporate all preceding paragraphs.

122.  Under the ESA, the Forest Service—in consultation with FWS—must rationally determine, based on the best scientific and commercial information available, whether Montanore's project will jeopardize the continued existence of any protected species or result in destruction or adverse modification of that species' critical habitat. 16 U.S.C § 1536(a)(2).

123. To stop at informal consultation—as the Forest Service and FWS did here with the Forest Service's aquatic BA and FWS' concurrence— the Forest Service was required to rationally determine, based on the best scientific and commercial information available and with FWS' written concurrence, that Montanore's project is not likely to adversely affect bull trout or their critical habitat. 50 C.F.R. § 402.13(a), (c); 16 U.S.C § 1536(a)(2); *see also* 50 C.F.R. § 402.12(a), (j).

124. Courts will find a BA inadequate where an agency acted arbitrarily, including when the agency failed to consider an important aspect of the problem, consider the relevant factors, or articulate a rational connection between the facts found and the choice made. *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 901 (9th Cir. 2002).

125. The Forest Service arbitrarily determined that Montanore's exploration "may affect" but is "not likely to adversely affect" bull trout and their critical habitat.

126. For example, the Forest Service failed to rationally evaluate the impacts to Libby Creek's bull trout—which, like all bull trout, need cold and clean water to survive—resulting from the elevated

temperatures and nitrogen levels of the effluent from Montanore's water treatment plant.

127. In reaching its conclusion that the effluent's elevated temperatures are not likely to adversely affect Libby Creek's bull trout, the Forest Service failed to consider several important aspects of the problem.

128. In addition, in its aquatic BA, the Forest Service failed to consider (much less rationally consider) (a) the high expected nitrogen levels in both Montanore's effluent and Libby Creek and (b) the effect on Libby Creek's bull trout from these high nitrogen levels.

129. In addition to being irrational, the Forest Service's conclusions, including its temperature and nitrogen conclusions, also violated the ESA's mandate to use the best available scientific and commercial data. 16 U.S.C § 1536(a)(2).

**SECOND CLAIM FOR RELIEF**
**(Against the Forest Service for Failure to Reinitiate Consultation Under the ESA)**

130. Plaintiffs hereby reallege and reincorporate all preceding paragraphs.

64

131. The ESA regulations require the Forest Service to reinitiate consultation with FWS regarding Montanore's project if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16(a).

132. Section 402.16(a) requires the Forest Service to reinitiate consultation with FWS: Montana's post-consultation repeal of the 275 µg/L nitrogen water quality standard revealed potential impacts to Libby Creek's bull trout not previously considered in the agencies' informal consultation. In concluding in the aquatic BA that nitrogen from Montanore's effluent would not harm Libby Creek's bull trout, the Forest Service assumed that "MDEQ would set a total nitrogen effluent limit to meet the standard of [275 µg/L]" and reasoned that "[i]ncreases in algal growth may not occur in response to an increased total nitrogen concentration to [275 µg/L]." Aquatic BA at 44–45. In fact, as shown by the Forest Service's EA and Montanore's mixing zone application, the nitrogen levels in Montanore's effluent and Libby Creek will be much higher than 275 µg/L. The now-repealed 275 µg/L nitrogen water

quality standard will no longer constrain Montana's ability to set a nitrogen limit for Montanore higher than this numeric standard.

133.  The Forest Service, however, did not reinitiate consultation regarding the effects of the repealed numeric nitrogen standard, in violation of 50 C.F.R. § 402.16(a).

**THIRD CLAIM FOR RELIEF**
**(Against the Forest Service for Arbitrary and Unlawful**
**Conclusion under the ESA that the Project Is Not Likely to**
**Adversely Affect Grizzly Bears or Their Important Habitat)**

134.  Plaintiffs hereby reallege and reincorporate all preceding paragraphs.

135.  As noted above, under the ESA, the Forest Service must rationally determine whether Montanore's project will jeopardize the continued existence of any protected species or result in destruction or adverse modification of that species' critical habitat. 16 U.S.C § 1536(a)(2). This analysis must be based on the best scientific and commercial information available, *id.*, and as detailed above, courts will invalidate an arbitrary BA, including one that fails to consider relevant factors or important aspects of the problem. *Native Ecosystems Council,* 304 F.3d at 901.

136.   During its informal ESA consultation, the Forest Service arbitrarily and unlawfully determined that the exploration project "may affect" but is "not likely to adversely affect" grizzly bears or their important habitat. In doing so, the Forest Service failed to rationally evaluate the impacts to grizzly bears from Montanore's increased industrial activity. The Forest Service also failed to use the best available scientific and commercial information.

137.   For example, in evaluating the impacts of Montanore's project on grizzly bears, the Forest Service failed to rationally consider several important aspects of the problem, including the current precarious condition of the Cabinet-Yaak grizzly population, the project's impacts on population connectivity, and the impact of illegal road access on baseline road density and core habitat assumptions. Additionally, the Forest Service failed to use the best available science, including regarding core habitat patch size, connectivity, and the 2024 SSA, in violation of the ESA. 16 U.S.C § 1536(a)(2); *see Native Ecosystems Council*, 304 F.3d at 901.

**FOURTH CLAIM FOR RELIEF**
**(Against FWS for Arbitrary and Unlawful Concurrence with the Forest Service's ESA Conclusions that the Project is Not Likely to Adversely Affect Bull Trout, Grizzly Bears, or their Important Habitat)**

138. Plaintiffs hereby reallege and reincorporate all preceding paragraphs.

139. FWS has an independent obligation under the ESA, 16 U.S.C. § 1536(a)(2), to ensure that actions that other federal agencies authorize will not jeopardize listed species or destroy or adversely modify their important habitat. During the consultation process, FWS "shall use the best scientific and commercial data available." *Id.*

140. FWS concurred with the Forest Service's "not likely to adversely affect" conclusion for bull trout, grizzly bears, and their important habitat despite numerous flaws in the Forest Service's aquatic and terrestrial BAs that render the BAs arbitrary and violate the ESA's requirement to use the best available scientific and commercial data. In its concurrence, FWS offered no further analysis of the effects the project would have on bull trout, grizzly bears, and their important habitat beyond what was offered in the BAs.

68

141. By concurring with the Forest Service's arbitrary and unlawful aquatic and terrestrial BAs, FWS acted arbitrarily and violated its own ESA obligations to (a) ensure that the exploration project will not adversely affect bull trout, grizzly bears, or their critical habitat and (b) to use the best scientific and commercial data available.

## FIFTH CLAIM FOR RELIEF
### (Against the Forest Service for Violation of NEPA—Failure to Take a Hard Look at Impacts of Montanore's Project)

142. Plaintiffs hereby reallege and reincorporate all preceding paragraphs.

143. NEPA requires the Forest Service to disclose and analyze the reasonably foreseeable environmental impacts of Montanore's exploration project. 42 U.S.C. § 4332(2)(C). The Forest Service violates NEPA when it fails to take a "hard look" at the environmental consequences of its actions. *CBD (Dec. 2025)*, at *2 (quotation and citation omitted). "To satisfy the 'hard look' requirement, an agency must provide a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Id.* (quotation and citation omitted).

144. The Forest Service violated NEPA's hard look requirement in multiple ways in the Service's EA for Montanore's exploration project.

145. For example, the Service's EA repeated the aquatic BA's same arbitrary conclusions regarding the project's expected effects on bull trout, including temperature and nitrogen effects on Libby Creek's bull trout. Thus, the Forest Service's NEPA conclusions that Montanore's project likely would not adversely affect Libby Creek's bull trout violated the hard look requirement.

146. In addition, the Forest Service's conclusion in the EA that the project "may affect but is not likely to adversely affect" grizzly bears or their important habitat relies on the Service's terrestrial BA and therefore is arbitrary in the same ways as the BA, including in its failure to rationally evaluate the precarious condition of the Cabinet-Yaak population, connectivity, core habitat patch size, and the impacts of illegal road access. The Forest Service thus violated NEPA by failing to disclose, analyze, or take a hard look at important environmental impacts of Montanore's exploration project on grizzly bears.

70

147.   The Forest Service also violated the hard look requirement by failing to rationally evaluate the project's effects on (a) potential drawdown of waters in the Cabinet Mountains Wilderness and (b) Libby Creek's water quality.

148.   For example, the Forest Service's conclusion that "[n]o surface water features are within the area of the one foot of water table drawdown," EA at 3-20, was directly contradicted by figures in the EA showing two feet of water table drawdown in an area of the Wilderness that includes multiple GDEs and Lower Libby Lake. Although Plaintiffs submitted comments pointing out this problem, the Service did not address its error. Thus, the Forest Service's EA was arbitrarily inconsistent, and the Service also arbitrarily failed to consider an important aspect of the problem.

149.   The Forest Service's water quality analysis in the EA also violated the hard look requirement. For example, the Service failed to rationally evaluate impacts to Libby Creek's water quality from the elevated nitrogen levels in Montanore's effluent.

150.   The Forest Service wrongly relied on Suplee and Watson (2013) to assert that high levels of nitrogen in Montanore's mixing

71

zone—up to 953 μg/L at the zone's end—would not cause algal growth in Libby Creek. Suplee and Watson, however, recommended a much lower nitrogen level—275 μg/L—for streams in this ecoregion.

151. In sum, the Forest Service violated NEPA's hard look requirement in several ways. 42 U.S.C. § 4332(2)(C); *see also CBD (Dec. 2025)* at *2.

## SIXTH CLAIM FOR RELIEF
## (Against the Forest Service for Violation of NEPA—Failure to Prepare an EIS)

152. Plaintiffs hereby reallege and reincorporate all preceding paragraphs.

153. NEPA requires an EIS for agency actions significantly affecting the quality of the environment. 42 U.S.C. § 4336(b)(1). An agency must prepare an EIS if "substantial questions" are raised about whether a project will have significant environmental impacts. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998). By contrast, to forego preparing an EIS, an agency must provide a "convincing statement" showing that a project's impacts are insignificant. *350 Montana*, 50 F.4th at 1265 (citation omitted).

154.   In concluding in its FONSI that Montanore's project would not significantly affect the quality of the environment, the Forest Service failed to provide a convincing statement showing that an EIS is unnecessary.

155.   First, for example, the Service arbitrarily concluded that Montanore's project would result in minimal impacts to bull trout and grizzly bears. That conclusion was arbitrary for various reasons, including those discussed above regarding the Forest Service's flawed conclusions on bull trout and grizzly bears.

156.   Second, as another example, in addressing whether Montanore's project would violate environmental laws, the Service failed to address routine violations of the Clean Water Act, Safe Drinking Water Act, and RCRA by Montanore's parent company, Hecla, at its other mining operations.

157.   The Forest Service must prepare an EIS because the Service failed to provide a convincing statement that the environmental impacts from Montanore's project would be insignificant.

**SEVENTH CLAIM FOR RELIEF**
**(Against the Forest Service for Violation of NFMA—Failure to**
**Show Substantive Compliance with Forest Plan Standard**
**FW-STD-WL-02)**

158. Plaintiffs hereby reallege and reincorporate all preceding paragraphs.

159. Under NFMA, the Forest Service must manage the Kootenai National Forest in compliance with the relevant forest plan and ensure that all site-specific projects, such as Montanore's exploration project, are consistent with the plan. 16 U.S.C. § 1604(i); *see also Native Ecosystems Council*, 418 F.3d at 961. Additionally, all Forest Service project approval documents, including EAs, BAs, and decision notices, must demonstrate substantive compliance with forest plan standards, such as the ones set forth in the Access Amendment. 36 C.F.R. § 219.15(d)(2); *see also CBD (Feb. 2025)*, at *4.

160. The Forest Service failed to demonstrate substantive compliance with forest plan standard FW-STD-WL-02 in its analyses of the project's environmental impacts. The standard requires acres of core habitat to be at least 60% of total acres in any BMU, and the terrestrial BA listed current core habitat at 60%—the lowest possible compliance percentage. However, in claiming that this standard was met, the

74

Forest Service acknowledged that the project would disrupt 269 acres of core habitat and failed to rationally consider the impacts of unauthorized motorized use and insufficient habitat patch size. Had the Forest Service rationally considered unauthorized road use and habitat patch size, the percentage of core habitat could have dropped below the requisite 60%.

161.  The Forest Service thus violated NFMA by failing to manage the Kootenai National Forest in compliance with the forest plan and failing to demonstrate substantive compliance with forest plan standards in approving the exploration project. 16 U.S.C. § 1604(a), (i); *see also Native Ecosystems Council*, 418 F.3d at 961.

## RELIEF REQUESTED

THEREFORE, Plaintiffs respectfully request that this Court:

1.     Declare that the Forest Service violated the ESA and acted arbitrarily in concluding that Montanore's project "may affect" but is "not likely to adversely affect" threatened bull trout, grizzly bears, and their important habitat;

2.     Declare that the Forest Service violated 50 C.F.R. § 402.16(a) by failing to reinitiate ESA consultation with FWS;

75

3.    Declare that FWS arbitrarily and unlawfully concurred with the Forest Service's conclusions that Montanore's project "may affect" but is "not likely to adversely affect" bull trout, grizzly bears, and their important habitat;

4.    Declare that the Forest Service violated NEPA by failing to take a hard look at the effects of Montanore's project;

5.    Declare that the Forest Service wrongly concluded that no EIS was required;

6.    Declare that the Forest Service violated NFMA by failing to demonstrate substantive compliance with forest plan Standard FW-STD-WL-02;

7.    Set aside the Forest Service's aquatic and terrestrial BAs, EA, and FONSI, as well as FWS' concurrence;

8.    Vacate and set aside the Forest Service's decision notice approving Montanore's exploration project in reliance on the aquatic and terrestrial BAs, EA, FONSI, and FWS' concurrence;

9.    Award Plaintiffs their reasonable fees and costs of litigation; and

10.    Grant Plaintiffs such other relief as the Court deems just and proper.

Respectfully submitted this 31st day of March, 2026.

/s/ Patton Dycus
Patton Dycus
Emma Shahabi
Shiloh Hernandez
Earthjustice
P.O. Box 4743
Bozeman, MT 59772-4743
(406) 586-9699 | Phone
(406) 586-9695 | Fax
pdycus@earthjustice.org
eshahabi@earthjustice.org
shernandez@earthjustice.org

*Counsel for Plaintiffs*